AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Louisiana

| | |
|---|---|
| United States of America<br>v.<br><br>MONTY MATTHEWS<br><br>*Defendant(s)* | Case No.<br>22-MJ-20 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __August 2, 2017 - March 19, 2022__ in the county of __East Baton Rouge__ in the __Middle__ District of __Louisiana__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Interstate Communication of a Threat with Intent to Extort |
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
Complainant's signature

Caitlin Bradley, Special Agent (FBI)
Printed name and title

Attested to by the applicant in accordance with the requirement of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: __March 22, 2022__

_____
Judge's signature

City and state: __Baton Rouge, LA__     Scott D. Johnson, U.S. Magistrate Judge
Printed name and title

USA Sealed Group
USM, USPO

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Caitlin Bradley, being duly sworn, do hereby depose and state the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been with the FBI since I began training in May 2016. I am presently assigned to the white-collar squad responsible for investigating complex financial crimes, including crimes involving wire fraud, bank fraud, securities fraud, money laundering, and other white-collar crimes. As a part of my work at the FBI, I have received training regarding these types of fraud and other white-collar crimes. The information contained in this Affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by financial institutions and my examination of reports and records. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where dates, figures, and calculations are set forth herein, they are approximate.

## OVERVIEW

2.  Based on the facts set forth below, there is probable cause to believe that MONTY MATTHEWS ("MATTHEWS"), the subject of this investigation, has committed the offenses of interstate communication of a threat with intent to extort, in violation of 18 U.S.C. § 875(b); and wire fraud, in violation of 18 U.S.C. § 1343. In particular,

MATTHEWS, with intent to extort from an elderly victim couple, LW and CW, sent, via interstate commerce, communications containing threats to injure the person of LW and CW. In addition, MATTHEWS unlawfully solicited and obtained approximately $1,066,853.00 in investment funds for fictitious companies using cellular telephone communications with LW and CW. In doing so, MATTHEWS devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, wherein he misrepresented the existence of the companies and investment opportunities to which LW's and CW's investment money was purportedly going, what it was going for, and the existence of fictitious fines, fees, taxes, and interest on those payments. In sum, MATTHEWS defrauded LW and CW out of approximately $1,066,853 in United States currency under the guise that said currency was being invested in actual companies, when in fact no such companies and investment opportunities existed, and for the purpose of executing such scheme and artifice, transmitted, and caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds. Certain of these communications via cellular telephone are set forth in more detail below. Based on threatening text messages received from MATTHEWS, LW refused to work with law enforcement even though she developed a belief that MATTHEWS was actually defrauding herself and her spouse, CW, from approximately June 2021 through February 2022. During that time period, LW had given MATTHEWS approximately $200,000.00, even though she believed that the money was not being invested on behalf of her and her spouse.

## THE SUBJECT

3. I have reviewed law enforcement databases for information about MATTHEWS. I have learned, in substance and in part, that MATTHEWS is an African-American male born in Louisiana on April 10, 1970. He is a citizen of the United States and has resided for at least the last 5 years in Baton Rouge, Louisiana. From my review of MATTHEWS' criminal history, I have learned that he has prior felony arrests for theft on three occasions, i.e., October 27, 2014, October 30, 2014, and February 13, 2015 (when he was also arrested for a felony offense of issuing worthless checks). MATTHEWS also has a total of eight outstanding arrest warrants, to include a January 21, 2016, warrant for issuing worthless checks and contempt of court and a May 16, 2021, warrant for domestic abuse battery. Both arrest warrants issued by the 23rd Judicial District Court in Ascension Parish, Louisiana.

4. At all times relevant to this Complaint, MATTHEWS claimed to be an investor in what was first identified as "the Company" and later referred to as HLOC INVESTMENT AGENCIES, a non-existent entity, along with other fictitious business entities. Once he had obtained LW's and CW's participation in the investment scheme, MATHEWS claimed to be their investment group team leader responsible for oversight of their cash investments. MATTHEWS told LW and CW that he was the only person with the ability to communicate with other members of their investment group and that he had engaged the services of a "federal agent" to ensure that LW and CW continued to make investment payments.

5. An open-source search provided no findings regarding HLOC INVESTMENT AGENCIES. There is no HLOC INVESTMENT AGENCIES registered with the Securities and Exchange Commission (SEC), and the Louisiana Office of Financial Institutions also has no record of HLOC INVESTMENT AGENCIES.

6. Throughout the scheme and artifice to defraud, MATTHEWS used cellular telephone numbers (225) 802-XX17, (337) 600-XX48, and (225) 324 XX96, with all numbers subscribed to by MATTHEWS' spouse, to communicate with LW at cellular telephone number (225) 588-XXXX, with that number being the only number used by LW during the entire time period covered by this complaint, and with Verizon Wireless as the only cell service provider for LW's cellular telephone number.

7. On March 21, 2022, Verizon Wireless advised me that the company maintains no SMS servers within the State of Louisiana. Therefore, all SMS message to and from LW's cellular telephone number traveled across state lines before being delivered to the recipient from LW's cellular telephone, or received by said cellular telephone.

8. Since August 2016, MATTHEWS' mother has have lived on Michel Delving Road in Baton Rouge, Louisiana, directly across the street from LW and CW.

9. In August 2016, MATTHEWS approached LW and CW and asked to borrow money to assist him with repairing purported structural damage to his residence. LW and CW loaned MATTHEWS approximately $50.00. For the next year, MATTHEWS continued to approach LW and CW requesting financial assistance, and promised them repayment.

10. In or around August 2017, a year after LW and CW first loaned money to MATTHEWS, he approached the couple with a purported investment opportunity that would allow them to recoup the amount that they had previously loaned MATTHEWS, along with an additional profit from the investment opportunity.

11. MATTHEWS stated that he had met an affluent individual named Richard Craft ("Craft"), who had befriended MATTHEWS and was willing to help him obtain funds needed to repair his home and to make additional profits through investment opportunities.

12. MATTHEWS further advised LW and CW that Craft was willing to invest on their behalf so, as stated above, they could recoup the money that they had loaned to MATTHEWS, along with the potential to make additional profits on their investment. MATTHEWS advised LW that no form of payment other than cash would be accepted by Craft.

13. LW and CW began to make a series of cash investments with Craft, with LW delivering said cash to MATTHEWS. LW and CW, however, never received any documentation regarding the investment funds they provided MATTHEWS, which were purportedly then funneled to Craft for investment. In addition, they were not provided information regarding Craft's investment agency, or the names or types of investments that Craft was making with their money. Moreover, LW and CW never met Craft, and they only briefly spoke with an individual who identified himself as Craft, with the communication made to the couple via a cellular telephone number associated with MATTHEWS, i.e., (225) 324-XX17. According to the Louisiana Office of Financial Institutions, there are no registered investment agents who go by the name Richard Craft or Monty Matthews in the State of Louisiana.

14. LW provided investment cash as directed by MATTHEWS. The transactions would involve MATTHEWS sending a text message to LW directing the amount of United States currency needed to make each individual investment, and for over 3 years the investments were required on almost a daily basis (to include multiple investments on individual days). The dollar amount for individual investments dictated to the couple by MATTHEWS ranged from approximately $200.00 to $2,000.00. MATTHEWS' investment

texts included a location where LW was required to meet MATTHEWS, along with a specific route that LW was required to follow to get to the meeting location.

15.  MATTHEWS told LW that if she failed to follow the route dictated by MATTHEWS, or if the transaction took longer than he had dictated, then a fine would be added to the cash that LW was investing. On one occasion, LW was given a particularly complicated route. Instead of following that route, LW took a shorter route. MATTHEWS advised LW that he knew that LW had deviated from the dictated route. As a result, LW came to believe that MATTHEWS, and individuals LW believed may have been associated with MATTHEWS, had put a tracker on her vehicle and telephone.

16.  Every investment demand and all corresponding communications from MATTHEWS were made to LW's cellular telephone from the only cellular telephone numbers that the couple associated with MATTHEWS, i.e., (225) 802-XX17, (337) 600-XX48, and (225) 324 XX96.

17.  On January 10, 2020, LW received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 802-XX17, that provided rates of return that enticed LW to continue investing with MATTHEWS. Said text stated: "The federal government is serious about the liquidated funds. It's because the rate of return is always at least 38.8%. So $730.69 made $1000 was made and the company matched $1000.00 so we made$1460.09 on $1000. And kept the $1000. So technically with the company matching I was $2460.9. Per $1000.00. So up to $439k is the drop. $867.6k was made today if you have as least $859k. It's a little tricky at first but you always want $800k available never lower and not above $1.2 million."

18. According to LW and CW, MATTHEWS had advised them that an individual named Agent FNU Winford ("Winford") was assigned to the investment firm.

19. On September 14, 2021, LW received a text message from a cellular telephone number associated with Matthews, i.e., (225) 324 XX96, stating: "AGENT WINFORD AGAIN I NEED TO SEE YOU WITHIN THE HOUR. I MEET YOU AT YOUR HOUSE . I DO HAVE A WARRANT FOR YOUR ARREST MRS. [LW]".

20. Later that same day, LW received another text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating: "MRS. [LW] AGENT WINFORD You will need to get your affairs in order. This is my final time communicating via electronic. When I get the signed paperwork. I am personally gonna bang on your home door 4 times. Count to 8 then will knock it down. You have gotten under my skin and I don't like scratching. You sleep well tonight. For tomorrow may be the day we come face to face. Only reason o count is being love dogs. Would be so pushed if I had to put your collie down. PEACE OUT CROOK."

21. Again, on that same day, LW received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96: stating: "MRS [LW] AGENT WINFORD MY PARTNER SAW YOU AT MCDONALDS AND WILL FOLLOW YOU HOME NOW."

22. On February 3, 2022, MATTHEWS directed that LW make a cash drop to him at a designated location in Baton Rouge, Louisiana. At approximately 2:57 p.m., FBI observed LW depart from the neighborhood where she resided. I personally identified and then followed LW to a McDonald's restaurant located at 720 Government Street in Baton Rouge. I then observed LW quickly approach and encounter an individual whom I confirmed

7

to be MATTHEWS. He was located in a tan Ford Expedition with tinted windows and no license plate affixed to the vehicle. An FBI surveillance team had previously observed the vehicle, with no license plate affixed to it, parked in the driveway at MATTHEWS' mother's residence on Michel Delving Road. LW briefly met with MATTHEWS at his vehicle, and then quickly returned to her vehicle and drove away from the restaurant. Another FBI agent followed the tan Expedition to a Burger King restaurant located at 2810 Scenic Highway in Baton Rouge. At approximately 3:30 p.m., the Expedition left the parking lot. After the vehicle entered the southbound entrance ramp of Interstate 110, FBI discontinued surveillance.

23.  On February 16, 2022, LW received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating: "I have to get the formula and the YEAR, QUARTER, MONTH,Day and TIME business close. Them divide that into the amount and you get your growth rate for the day and your money gain. Its NEVER A LOST. This is 16 years and this year's projections minimum gain of rate. Its in $10k Dollars group of growth. Like last months was 1.067% per 24hour multiplied by company matched dollars divided by how much money gained. Ended up a $4,579.99 per $10k so $22,568 plus company matching end growth was $37,679.00 that biweekly $54,568.78." MATTHEWS then sent LW a text message containing the following chart:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1.000 | 1 | 1 | 1 | 1.000 | 1 | 1 | 1 | |
| 1.000 | 0.969** | 0.968** | 0,998 | 0.998 | 1 | 0,998 | 0,972 | |
| 0.977 | 0.966** | 0.945*** | 0,988 | 0.990 | 0,998 | 0,986 | 0,957 | |
| 0.974* | 0.967** | 0.970** | 0,998 | 0.975** | 1 | 1,007 | 0,992 | |
| 0.979 | 0.967** | 0.947*** | 0.967*** | 0.989 | 0,995 | 0,979 | 0,967 | |
| 1.007* | 0.980* | 0.967** | 0.975** | 0.976** | 1 | 0,983 | 0,991 | |
| 1.284*** | 1.273*** | 1.279*** | 0,934 | 1,165 | 1,027 | 1,063 | 1.250** | |
| 1.275*** | 1.325*** | 1.321*** | 0,927 | 1,154 | 1,049 | 1.210*** | 1.235** | |
| 1.143* | 1,117 | 1,141 | 0,922 | 1,072 | 0.845* | 0.820** | 0,912 | |
| 1.128* | 1,097 | 1,03 | 0.903* | 1,051 | 0.869* | 0,889 | 0.741* | |
| 1.376*** | 1.365*** | 1.337*** | 0.902* | 1,13 | 1.148* | 1.146** | 1.222** | |
| 1.354*** | 1.355*** | 1.321*** | 0.901* | 1.139* | 1.123* | 1.149** | 1.220** | |
| 1.539*** | 1.515*** | 1.471*** | 0,905 | 1.191* | 1,122 | 1.166** | 1.337*** | |
| 1.462*** | 1.488*** | 1.416*** | 0,906 | 1.185* | 1.119* | 1.222** | 1.263* | |
| 1.022 | 1,006 | 1.004 | 0,928 | 0.938 | 0.745** | 0.688** | 0.568** | |
| 1.033 | 1,04 | 1,033 | 0,958 | 0.923 | 0.740** | 0.661** | 0.474** | |
| 0.979 | 0,986 | 1.008 | 0,942 | 0.968 | 0.790** | 0.705** | 0.496** | |
| 1.047 | 0.913 | 1,028 | 0,927 | 0.920 | 0.753** | 0.628*** | 0.474** | |
| 0.980 | 0,988 | 0.999 | 0,921 | 0.953 | 0.790** | 0.703*** | 0.439** | |
| 1.033 | 1,017 | 1,03 | 0,928 | 0.933 | 0.755** | 0.645** | 0.436** | |
| 1.254*** | 1.254** | 1.165* | 0.908 | 1,159 | 0,985 | 0,956 | 0,982 | |
| 1.259*** | 1.259*** | 1.211** | 0,949 | 1,195 | 0,971 | 0,97 | 1,01 | |
| 1.247*** | 1.271*** | 1.181* | 0.895* | 1,101 | 1,005 | 0,968 | 0,891 | |
| 1.271*** | 1.244** | 1,157 | 0.904* | 1,117 | 0,984 | 0.882* | 0,954 | |
| 1.211*** | 1.274** | 1.225*** | 0.819** | 1,09 | 1,023 | 1.095* | 0,918 | |
| 1.231*** | 1.211*** | 1.125*** | 0.837** | 1,061 | 1,108 | 1,013 | 0,864 | |
| 1.219*** | 1.313*** | 1.232*** | 0.830** | 1,076 | 1,08 | 0,976 | 0,876 | |
| 1.260*** | 1.241*** | 1.176*** | 0.853* | 1,054 | 1.132* | 1,069 | 0,862 | |
| 1.330*** | 1.468*** | 1.267*** | 0.900 | 1,056 | 1.173** | 1.490** | 0,831 | |
| 1.328*** | 1.392*** | 1.244*** | 0.864* | 1,064 | 1.348** | 1.439*** | 0,858 | |
| 1.123** | 1.085* | 1.202** | 0.831** | 1,005 | 0.840* | 0.802** | 0,854 | |
| 1.136** | 1,062 | 1,125 | 0.863* | 1,074 | 0,986 | 0.877* | 0,812 | |
| 1.153** | 1.139** | 1.231** | 0.931 | 1,02 | 0,871 | 0.836* | 0,855 | |
| 1.154** | 1.091* | 1,093 | 0,915 | 1,222 | 1,075 | 0,96 | 0.592* | |
| 1.176*** | 1.209** | 1.260** | 0.830** | 1,324 | 0,91 | 0.793* | 0,833 | |
| 1.109** | 1.359** | 1,412 | 0.839* | 1,57 | 0,961 | 1,355 | 0,76 | |
| 1.112* | 1.106* | 1.195** | 0.865** | 1,016 | 0,893 | 0.835** | 1,002 | |
| 1.086* | 1,079 | 1.112* | 0,904 | 1,033 | 0,891 | 0,901 | 0,871 | |
| 1.120* | 1.133* | 1.251** | 0.886* | 1,01 | 0,9 | 0,88 | 0,971 | |
| 1.137** | 1,099 | 1.191** | 0,919 | 1,022 | 0,886 | 0,921 | 0,958 | |
| 1.219*** | 1.260*** | 1.332*** | 0.876** | 1,056 | 0,975 | 1,02 | 0,886 | |
| 1.144*** | 1.132** | 1.216*** | 0,923 | 1,076 | 0,965 | 1,045 | 0,896 | |
| 1.200*** | 1.326** | 1.189* | 0,969 | 1,055 | 1 | 0,974 | 0,735 | |
| 1.191** | 1.200** | 1,167 | 0.865** | 1,084 | 1,018 | 0.769** | 0,689 | |
| 1.534*** | 1.515*** | 1.461*** | 0,906 | 1,153 | 1.119* | 1.195** | 1.243* | |
| 1.522*** | 1.500*** | 1.433*** | 0,907 | 1,155 | 1.124* | 1.187* | 1.252* | |

AR,BIC model, root MSPE. Models retained in model confidence set are in bold, the minimum

24. On February 27, 2022, after LW was unable to get cash demanded by MATTHEWS that day, LW received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating: "YOUR ACCOUNT IS IN AUCTION STAGE YOUR OUTSTANDING BALANCE WILL BE CHARGED IN COURT YOUR COURT SUMMONS WILL BE DELIVERED WITHIN 24-48'HOURS AFTER ACCOUNT RECLAIMED YOUR ABILITY TO ASSOCIATE WITH MEMBERS DURING THE LEGAL ACTION IS PROHIBITED YOUR PROFILE AND DEVICES HAVE BEEN BLOCKED FROM ACCESSING MEMBERSHIP MEMBERS. This is

Federal law.YOUR ADVISE TO GET LEGAL ASSISTANCE TO HELP MAKE SENSE OF THE LEGALITY. You will be contacted within 45-60 minutes of your account sold by a legal representative."

25. According to LW and CW, if they could not pay the amount demanded by MATTHEWS, then they were threatened that they may be sued or arrested via text messages from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96. For example, on March 1, 2022, at approximately 1:42 p.m., LW received a text from the aforementioned cellular telephone number stating: "you are gonna go to court Miss [LW] if payment isn't made. We are going to Sue. Make no mistake about that."

26. On March 9, 2022, LW received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating, "Friday you can just pay the $376.78 to get everything done and delivered good night." LW and CW believed MATTHEWS' statement meant that they were going to get a full return on all the money they invested. MATTHEWS had previously provided, via text message, a picture of a safe that he indicated they should purchase to safeguard the investment return funds that they were about to receive, and that he had already purchased the same safe to safeguard his profits.

27. On or about March 11, 2022, a controlled cash "drop" was made by LW to MATTHEWS using official FBI funds. I met with CW at approximately 8:30 a.m. that day and provided him with $380.00 of the aforementioned funds. LW had previously advised me that it was common for MATTHEWS to request very specific dollar amounts (e.g., the $376.78 on this occasion), and the couple would simply round up to a whole dollar amount. CW returned to the couple's residence and transferred the $380.00 to LW, who then placed

10

the money in an envelope and wrote "$380" on the outside of the envelope. FBI agents continued surveillance on LW as she departed the couple's residence at approximately 10:45 a.m. and followed the standard route to a Chase Bank located on Siegen Lane in Baton Rouge. LW appeared to follow her normal method of obtaining cash by accessing the bank's ATM to withdraw funds. Shortly after LW departed from the couple's residence, an agent, who was conducting surveillance at MATTHEWS mother's residence, observed MATTHEWS depart in a black Chevrolet Cruz. LW's spouse had earlier advised me that MATTHEWS directed LW to meet him at a Winn-Dixie grocery store, also located on Siegen Lane in Baton Rouge.

28.     After departing from Chase Bank, LW was observed driving to the aforementioned Winn-Dixie. Once LW arrived in the parking lot, LW parked near the vehicle that MATTHEWS had driven from his mother's residence. At approximately 10:53 a.m., an agent conducting surveillance observed LW and MATTHEWS exit their respective vehicles and saw LW hand an envelope to MATTHEWS. Both LW and MATTHEWS quickly returned to their respective vehicles and drove out of and away from the Winn-Dixie parking lot where they had just met.

29.     After the cash "drop," MATTHEWS texted LW and asked how much LW had given him. LW advised MATTHEWS that she had given him $380.00. According to the couple, MATTHEWS normally required LW to text him after the meetings to advise him how much money LW had just provided to him. On this particular occasion, LW forgot to text MATTHEWS and provide the required dollar amount. As a result, MATTHEWS texted LW and asked for the amount.

11

30.     On March 13, 2022, LW received a text from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating: "Before I go, can you please inform whoever is the contact person for LW/225 [MATTHEWS' nickname for LW in text messages]. It has not been any contact information for over 18.5 hours. That is a violation of the agreement, and the process will be removed and put back in legation. Thank you Monty".

31.     On March 16, 2022, LW received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating: "If your capable of getting $120.00. We will release the $1.5 million dollars disbursement. If you get $67.00 before 12:00 noon we will approve a 4 day extension with no fees or fines. These amounts are all tax free. Good luck Miss [LW] we are pulling for you."

32.     That same day, a controlled cash "drop" was made by LW to MATTHEWS using official FBI funds. I met with CW and provided him with $80.00 from official FBI funds. LW then sent MATTHEWS a text message stating: "We now have the amount required." LW then received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating "Bring it out." Then, at approximately 1:01 a.m., LW walked out of her house and met MATTHEWS as he was exiting his mother's driveway on Michel Delving Road in the tan Ford Expedition, still without a license plate attached to it. LW handed MATTHEWS the $80.00 (that had earlier been provided to CW by me). MATTHEWS then proceeded to drive south down Michel Delving Road, passing me. LW texted MATTHEWS after the exchange the characters "$80" to confirm the amount she had given him. At approximately 11:02 a.m., MATTHEWS was seen taking a left turn onto Perkins Road in Baton Rouge. At approximately 11:55 a.m., MATTHEWS returned to his mother's residence on Michel Delving Road.

33. On March 19, 2022, after the couple advised MATTHEWS that they could not provide him with cash that day, LW received a text message from a cellular telephone number associated with MATTHEWS, i.e., (225) 324 XX96, stating: 'EVERYONE SEE WHAT THESE FRAUDULENT SOB SAY TODAY? PLEASE CONTACT PHIL AND GO PICKED THE BOTH UP ASAP. WE ARE PRESSING ALL CHARGES. I WANT BOTH ARRESTED TODAY!! I domes care about what you say. WE ARE GOING FORWARD WITH THE CRIMINAL CHARGES. No MORE GAMES NO MORE CONVERSATIONS. YOU CAN BOTH COME OUTSIDE IN 8 MINUTES OR WE ARE COMING IN."

34. Based on my review of LW's and CW's total record of payments made to MATTHEWS over the course of his scheme and artifice to defraud, LW made a total of 4,515 cash "drops" (deliveries) and turned over to MATTHEWS fraudulently solicited and obtained proceeds in the amount of approximately $1,066,853.00 in United States currency.

35. Based upon the foregoing facts, I have probable cause to conclude that MATTHEWS has committed the offenses of interstate communication of a threat with intent to extort, in violation of 18 U.S.C. § 875(b), and wire fraud, in violation of 18 U.S.C. § 1343.

I hereby swear that the information contained in this Affidavit is true and correct to the best of my knowledge.

_____
Caitlin Bradley, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Federal Rules of Criminal Procedure 4.1 and 41(d)(3) on this __22nd__ day of March 2022, at Baton Rouge, Louisiana.

_____
SCOTT D. JOHNSON
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF LOUISIANA